UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

THOMAS REYNOLDS,

                *Plaintiff,*

v.

OSWEGO HEALTH, INC.,

                *Defendant.*

Civil Action No.: 5:21−cv−00976 (MAD/ML)

**COMPLAINT**

---

Plaintiff Thomas Reynolds, by and through his undersigned counsel, Eisenberg & Baum, LLP, hereby states his Complaint against Defendant Oswego Health as follows based upon personal knowledge and information and belief:

## INTRODUCTION

1. Language is the cornerstone of the patient-physician relationship. Indeed, "it is primarily through language that the physician works to establish rapport and trust. Good physician-patient communication is fundamental to good health care." E. McEwen & H. Anton-Culver, Journal of Family Practice, Vol. 26, No. 3:289–291, 291 (1988). Effective communication between medical providers and patients provides better patient safety, treatment, and health care outcomes.

2. As a deaf American, Plaintiff Thomas Reynolds communicates primarily in American Sign Language ("ASL"). As such, he requires an ASL interpreter to effectively communicate and participate in a medical setting.

3. Over the course of twenty-three days, Plaintiff received health care services at Defendant's facilities after Plaintiff fractured his hip, including surgery and rehabilitation. Plaintiff continued to receive home care from another of Defendant's facilities for about a month thereafter. Plaintiff repeatedly requested ASL interpreters throughout this time period to fully understand and participate in his care.

4. Defendant consistently refused those requests and failed to provide Plaintiff with ASL interpreters despite knowing that Plaintiff is deaf and receiving his requests for interpreters, preventing Plaintiff from enjoying the same services that a hearing person would.

5. Without equally effective communication, Plaintiff could not make informed health care choices. Instead, he experienced heightened anxiety throughout his nearly two-month long treatment. Defendant's actions and inactions caused him to be anxious and afraid of misunderstanding his treatment options. This was especially true because Plaintiff was heavily drugged with opioid narcotics, and therefore highly confused for most of his stay at Defendant's facility.

6. Thus, Defendant discriminated against Plaintiff by refusing to provide the ASL interpreters that he required to understand and participate in his health care.

7. Based on Plaintiff's experience, it is also evident that Defendant has failed to implement policies, procedures, and practices respecting the civil rights and communication needs of deaf individuals. Plaintiff brings this lawsuit to compel Defendant to cease its unlawful discriminatory practices and implement policies and procedures that will ensure effective communication, full and equal enjoyment, and a meaningful opportunity for deaf individuals to participate in and benefit from Defendant's health care services.

8. Plaintiff brings this action seeking injunctive and declaratory relief, non-economic nominal and compensatory damages, and attorneys' fees and costs to redress Defendant's unlawful discrimination against him on the basis of his disability in violation of Section 1557 of the Patient Protection and Affordable Care Act ("ACA"), 42 U.S.C. § 18116; and the New York Human Rights Law ("NYHRL"), N.Y. Exec. L. § 290 et seq.

## THE PARTIES

9. Plaintiff is in his 70s and is a resident of Oswego County, New York, who is substantially limited in the major life activities of hearing and speaking. Thus, he is a qualified individual with a "disability" within the meaning of federal and state civil rights laws.

10. Upon information and belief, defendant Oswego Health, Inc. has at all relevant times been a corporation organized and operating within the State of New York and maintaining its offices and principal place of business at 110 W. 6th Street, Oswego, NY 13126. Upon information and belief, Defendant Oswego Health, Inc. owns and/or operates Oswego Hospital, The Manor at Seneca Hill, and Oswego Health Home Care, all maintaining their principal places of business in Oswego, New York.[1] Upon information and belief, Oswego Health, Inc. receives and accepts federal financial assistance, including but not limited to Medicare and/or Medicaid reimbursements.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 for Plaintiff's claims arising under federal law, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiff's claims arising under state and city law.

12. Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendant resides within in this District and the conduct giving rise to this Complaint occurred in this District.

## STATEMENT OF FACTS

13. Plaintiff Thomas Reynolds is a man in his 70s who is profoundly deaf, and whose primary and most effective means of communication is American Sign Language.

---

[1] *See* https://www.oswegony.org/work/oswego-health.

**Oswego Hospital - June 26 through July 1, 2020**

14. In the late evening of June 25, 2020, Plaintiff was brought by ambulance to the Emergency Department at Oswego Hospital for surgery after he fell and fractured his hip. Plaintiff remained at Oswego Hospital until July 1, 2020.

15. Plaintiff informed ambulance staff that he would need an ASL interpreter upon arriving at Oswego Hospital. However, none was provided.

16. Instead, Oswego Hospital staff offered Plaintiff an "interpreter on wheels" service, a Video Remote Interpreting ("VRI") service.

17. Complaints about VRI are widespread among the Deaf community. Indeed, Plaintiff had multiple problems with VRI at Oswego Hospital and other hospitals in the past. VRI services have frequent issues including lags, choppy, blurry, or grainy images, and irregular pauses in communication. Every time VRI freezes and restarts, it displays a new interpreter. Thus, in a medical setting, a patient using VRI may have numerous interpreters, each of whom know nothing about the content or context of what was previously said. In contrast, even if a long medical appointment requires two in-person interpreters so that one may rest until needed, both stay near the patient so that one can easily pick up where the other left off without any difficulty. In those situations, in-person interpreters are always well-informed as to the conversation.

18. Accordingly, given the serious nature of his injuries, Plaintiff did not want to use Oswego Hospital's VRI and repeated his requests for an in-person interpreter to ensure effective communication with hospital staff. Further, Plaintiff had to attempt to justify his frustrations to with VRI to hospital staff through writing notes back and forth in English, which, combined with the medication given to Plaintiff, exacerbated Plaintiff's frustration and caused him extreme stress.

4

19. Because Oswego Hospital never once offered or provided Plaintiff with an in-person ASL interpreter at previous Emergency Department visits, and to avoid using Oswego Hospital's ineffective VRI, Plaintiff texted his friend Cody Ericksen shortly after arriving to meet Plaintiff at the Emergency Department and interpret for Plaintiff.

20. Mr. Ericksen knows some sign language but is not an ASL interpreter, and Plaintiff felt that Mr. Ericksen was his only chance to communicate with Oswego Hospital staff absent a full-time in-person interpreter.

21. Indeed, Plaintiff's medical records from Oswego Hospital note that "[t]he patient communicates by sign language from another man in the room in the ED," referring to Mr. Ericksen.

22. Mr. Ericksen remained at Oswego Hospital from about 10:45 p.m. on June 25 to about 2:45 a.m. on June 26.

23. During this time, Mr. Ericksen requested in-person ASL interpreters from Oswego Hospital staff on Plaintiff's behalf.

24. Plaintiff also requested in-person ASL interpreters from Oswego Hospital staff throughout Plaintiff's stay.

25. Despite these requests, Oswego Hospital provided Plaintiff an interpreter only on June 28 and June 29, and for no more than four hours each day.

26. For the remainder of Plaintiff's five-day stay, Oswego Hospital staff attempted to communicate with Plaintiff primarily through note-writing. One staff member, Judy Wood, noted that "pt. is deaf but able to read notes that I write." Staff also attempted to read consent forms to Plaintiff and use lipreading to communicate, despite lipreading being a completely ineffective means of communicating complex medical information.

27. Note-writing and lipreading were particularly ineffective for Plaintiff because he was heavily drugged with opioid narcotics and in a highly confused state for most of his stay. Plaintiff's ability to read lips and understand notes in English were essentially non-existent.

**The Manor at Seneca Hill - July 1 through July 18, 2020**

28. On July 1, 2020, Plaintiff was discharged from Oswego Hospital and transferred to the Manor at Seneca Hill ("SHM"), an Oswego Health inpatient skilled nursing facility, where he remained for rehabilitation until July 18, 2020.

29. SHM also refused to provide Plaintiff with any in-person interpretive services despite Plaintiff's repeated requests. Instead, SHM staff primarily used note-writing to attempt to communicate with Plaintiff regarding his treatment. Staff noted that Plaintiff is "Deaf, communicates via writing" and "communicated with pen and paper."

30. Accordingly, for eighteen days, Plaintiff was unable to communicate in his primary language regarding his health care.

**Oswego Home Health Care - July 18 through August 19, 2020**

31. On July 18, 2020, Plaintiff was discharged from SHM to receive home care including physical and occupational therapy from Oswego Home Health Care ("OHHC"), another Oswego Health facility, until about August 19, 2020.

32. On July 21, 2020, shortly after Plaintiff began receiving home care from OHHC, registered nurse Kristen Callahan noted in an OHHC patient record that "Pt will need sign language interpretation, is was agreeable to SOC being done with writing. sign language would be much easier for all involved. . . . SN and PT needs to be coordinated r/t interpreter."

33. Despite noting his need for ASL interpreters, OHHC also refused to provide Plaintiff with any in-person interpretive services despite Plaintiff's repeated requests. Instead, OHHC staff primarily used note-writing to attempt to communicate with Plaintiff.

34. Accordingly, Plaintiff was unable to communicate in his primary language with OHHC staff during his month-long home care.

**General Facts**

35. Upon information and belief, Defendant and its employees follow the recommendations and regulations of the Joint Commission.

36. Upon information and belief, Defendant and its employees follow the recommendations for effective communication in the Joint Commission's Advancing Effective Communication, Cultural Competence, and Patient- and Family-Centered Care: A Roadmap for Hospitals, https://bit.ly/3usVEEh.

37. Consistent with the Joint Commission's guidance, Defendant has a responsibility to "develop a system to provide language services to address the communication needs of patients whose preferred language is not English, including patients who communicate through sign language." *Id*. at page 40.

38. Defendant has a responsibility to identify a "patient's preferred language for discussing health care." *Id*. at page 10.

39. If necessary to determine a patient's preferred language, Defendant should "[a]rrange for language services to help identify the patient's preferred language," and once the preferred language is identified, Defendant should "[n]ote the patient's preferred language for health care discussions in the medical record and communicate this information to staff." *Id*.

40. The Joint Commission requires hospitals like Defendant to "[p]rovide an interpreter

for the patient's preferred language during informed consent discussions, even if the hospital provides translated materials, to facilitate patient communication." *Id*. at page 20.

41. As advised by the Joint Commission, Defendant is aware that "[e]xchanging written notes . . . will likely be effective communication for brief and relatively simple face-to-face conversations." *Id*. at page 69.

42. Similarly, Defendant is aware that "[w]ritten forms or information sheets may provide effective communication in situations with little call for interactive communication, such as providing billing and insurance information or filling out admission forms and medical history inquiries." *Id.* at page 69.

43. New York state's emergency-interpreter law requires Defendant to provide "patients in the emergency service" like Plaintiff an interpreter "within 10 minutes of a request by the patient [or] the patient's family." 10 N.Y.C.R.R. § 405.7(a)(7)(ix)(a).

44. Defendant's discrimination against Plaintiff, and Plaintiff's resulting lack of understanding as to his care, caused Plaintiff to suffer humiliation, anger, frustration, stress, anxiety, and emotional distress.

45. Defendant and its staff knew that Plaintiff is deaf, were aware that Plaintiff made repeated requests for in-person interpreters, and documented Plaintiff's need for interpreters.

46. Defendant also knew or should have known of its obligation as a health care provider under the ACA to develop policies and promote compliance with these statutes and to provide reasonable accommodations, including but not limited to the provision of in-person ASL interpreters to ensure effective communication with deaf persons.

47. Defendant and its staff knew or should have known that their actions and/or inactions created an unreasonable risk of causing Plaintiff greater levels of fear, anxiety, indignity,

humiliation, and/or emotional distress than a hearing person would be expected to experience.

48. Nonetheless, Defendant prevented Plaintiff from fully benefitting from its services by failing to provide the ASL interpreters necessary for his full participation in and understanding of his care.

49. In doing so, Defendant intentionally discriminated against Plaintiff and acted with deliberate indifference to his federally protected rights.

50. Defendant's wrongful and intentional discrimination against Plaintiff on the basis of his disability is reflected by Defendant's failure to train employees and promulgate policies of non-discrimination against deaf individuals.

51. As a result of Defendant's failure to ensure effective communication with Plaintiff, Plaintiff received services that were objectively substandard and that were inferior to those provided to patients who are hearing.

52. Plaintiff is entitled to equal access to services offered by Defendant as are enjoyed by non-disabled persons.

53. Plaintiff still wishes to access Defendant's services and receive care from Defendant's facilities, but is deterred from doing so by Defendant's discrimination against him.

## CAUSES OF ACTION

**COUNT I: Violations of Section 1557 of the Patient Protection and Affordable Care Act**

54. Plaintiff incorporates by reference all preceding paragraphs and realleges them in support of this claim.

55. At all times relevant to this action, the ACA has been in full force and effect and has applied to Defendant's conduct.

56. At all times relevant to this action, Plaintiff has had substantial limitations to the

9

major life activities of hearing and speaking and has been an individual with a disability within the meaning of the ACA, 42 U.S.C. § 18116.

57. At all times relevant to this action, Defendant received federal financial assistance, including Medicare and Medicaid reimbursements, and has been principally engaged in the business of providing health care. Thus, Defendant is a health program or activity receiving federal financial assistance under 42 U.S.C. § 18116(a).

58. Under the ACA, "an individual shall not, on the ground prohibited under . . . section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794), be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance." 42 U.S.C. § 18116.

59. Federal regulations implementing the ACA provide that a covered entity "shall take appropriate steps to ensure that communications with individuals with disabilities are as effective as communications with others in such programs or activities, in accordance with the standards found at 28 CFR 35.160 through 35.164." 45 C.F.R. § 92.102(a).

60. Accordingly, federal regulations implementing the ACA also provide that a "[covered] entity shall furnish appropriate auxiliary aids and services when necessary to afford individuals with disabilities, including applicants, participants, companions, and members of the public, an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a [covered] entity. . . . In determining what types of auxiliary aids and services are necessary, a [covered] entity shall give primary consideration to the requests of individuals with disabilities. In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability. 28 C.F.R. § 35.160(b), *cited by* 45 C.F.R. § 92.102(a).

61. Federal regulations implementing the ACA further require that a covered entity that provides individuals with disabilities "qualified interpreters via VRI services shall ensure that it provides–(1) Real-time, full-motion video and audio over a dedicated high-speed, wide-bandwidth video connection or wireless connection that delivers high-quality video images that do not produce lags, choppy, blurry, or grainy images, or irregular pauses in communication; (2) A sharply delineated image that is large enough to display the interpreter's face, arms, hands, and fingers, and the participating individual's face, arms, hands, and fingers, regardless of his or her body position; (3) A clear, audible transmission of voices; and (4) Adequate training to users of the technology and other involved individuals so that they may quickly and efficiently set up and operate the VRI." 28 C.F.R. § 35.160 (*cited by* 28 C.F.R. §§ 35.104 & 36.303(f); in turn *cited by* 45 C.F.R. § 92.102(b)(1)(i)).

62. As set forth above, Defendant discriminated against Plaintiff on the basis of his disability in violation of the ACA and its implementing regulations.

63. The ACA, by incorporating the enforcement mechanism of the Rehabilitation Act, extends a cause of action to Plaintiff–that is, "any person aggrieved" by discrimination in violation of the Rehabilitation Act. 42 U.S.C. § 18116(a).

64. Defendant has failed to implement policies, procedures, and training of staff necessary to ensure compliance with the ACA.

65. Plaintiff is entitled to injunctive relief, attorneys' fees, costs, and disbursements, nominal damages, and compensatory damages for the injuries and loss he sustained as a result of Defendant's discriminatory conduct and deliberate indifference as alleged under 42 U.S.C. § 18116(a).

### COUNT II: Violations of the New York Human Rights Law

66. Plaintiff incorporates by reference all preceding paragraphs and realleges them in support of this claim.

67. At all times relevant to this action, the NYHRL, Article 15 of the New York Executive Law § 290 et seq., has been in full force and effect and has applied to Defendant's conduct.

68. At all times relevant to this action, Plaintiff has had substantial impairments to the major life activities of hearing and speaking and has been a qualified individual with a disability within the meaning of the NYHRL, N.Y. Exec. L. § 292(21).

69. On March 19, 2021 Plaintiff filed a complaint against Defendant with the New York State Division of Human Rights ("NYSDHR"), alleging a violation of the NYHRL (NYSDHR Case No. 10211318).

70. By letter dated August 5, 2021, the NYSDHR dismissed Plaintiff's complaint "on the grounds of administrative convenience," noting that "[t]he Complainant intends to pursue federal remedies in court, in which forum all the issues concerning the question of discrimination charged can be resolved."

71. The NYHRL provides that "where the Division has dismissed such complaint on the grounds of the administrative convenience, . . . such person shall maintain all rights to bring suit as if no complaint had been filed." N.Y. Exec. L. § 297.9.

72. At all times relevant to this action, Defendant's facilities have been places of public accommodation within the meaning of the NYHRL, N.Y. Exec. L. § 292(9).

73. Pursuant to N.Y. Exec. L. § 296(2)(a), "[i]t shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation, resort or amusement, because of the . . . disability

or marital status of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof, . . . to the effect that any of the accommodations, advantages, facilities and privileges of any such place shall be refused, withheld from or denied to any person on account of . . . disability . . . or that the patronage or custom threat of any person of or purporting to . . . having a disability is unwelcome, objectionable or not acceptable, desired or solicited."

74. Pursuant to N.Y. Exec. L. § 292(2)(c), discrimination includes the "refusal to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford facilities, privileges, advantages or accommodations to individuals with disabilities."

75. Defendant discriminated against Plaintiff on the basis of his disability in violation of the NYHRL.

76. Plaintiff is therefore entitled to compensatory damages for the injuries and loss sustained as a result of Defendant's discriminatory conduct as hereinbefore alleged pursuant to the NYHRL, N.Y. Exec. L. § 297(9).

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Thomas Reynolds respectfully requests that this Court:

A. Enter a declaratory judgment under Rule 57 of the Federal Rules of Civil Procedure, stating that Defendant's policies, procedures, and practices have subjected Plaintiff to unlawful discrimination in violation of Section 1557 of the Patient Protection and Affordable Care Act and the New York Human Rights Law;

B. Issue an injunction forbidding Defendant from implementing or enforcing any policy, procedure, or practice that denies deaf or hard of hearing individuals or their companions

meaningful access to, and full and equal enjoyment of, Defendant's facilities, services, or programs;

    C.    Issue an injunction ordering Defendant to:

        i.    develop, implement, promulgate, and comply with a policy requiring that when a deaf or hard of hearing individual requests an in-person interpreter for effective communication, when other means are not effective one will be provided as soon as practicable in all services offered by Defendant;

        ii.    develop, implement, promulgate, and comply with a policy to ensure that Defendant will notify individuals who are deaf and hard of hearing of their right to effective communication; including posting explicit and clearly marked and worded notices that Defendant will provide sign language interpreters upon request to ensure effective communication with deaf or hard of hearing persons;

        iii.    develop, implement, promulgate, and comply with a policy to ensure that deaf or hard of hearing individuals are able to communicate through the most appropriate method under the circumstances, recognizing that the Video Remote Interpreting system is not appropriate in all medical situations;

        iv.    create and maintain a list of sign language interpreters and ensure availability of such interpreters at any time of day or night;

        v.    train all employees, staff, and other agents on a regular basis about the rights of individuals who are deaf or hard of hearing under the ACA and NYHRL;

  D.  Award to Plaintiff:

        i.    Compensatory damages;

        ii.    Nominal damages;

    iii.    Reasonable costs and attorneys' fees;

    iv.    Interest on all amounts at the highest rates and earliest dates allowed by law; and

    v.    Any and all other relief that this Court deems just and appropriate.

Dated: August 31, 2021

                                               Respectfully submitted,

                                               EISENBERG & BAUM, LLP

                                               By:_____
                                               Andrew Rozynski, Esq.
                                               24 Union Square East, PH
                                               New York, NY 10003
                                               (212) 353-8700
                                               (917) 591-2875
                                               ARozynski@eandblaw.com
                                               *Attorneys for Plaintiff*